FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN -9 PM 3: 26

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEAN MARCHESE ET AL.                          CIVIL ACTION

VERSUS                                        NO. 03-3082

SECRETARY, UNITED STATES                      SECTION "K" (2)
DEPARTMENT OF THE INTERIOR

## ORDER AND OPINION ON MOTION

Defendant, Gale Norton, the Secretary of the Interior, filed a motion for summary

judgment to enforce the settlement in this matter. Record Doc. No. 57. Plaintiffs, Jean

Marchese and Geraldine Ieva, appearing pro se, filed an opposition memorandum.

Record Doc. No. 58. The court held an evidentiary hearing on the motion on August 18,

2005.

Having reviewed the complaint, as amended; the record; the testimony and

exhibits introduced at the evidentiary hearing; the submissions of the parties and the

applicable law, IT IS ORDERED that defendant's motion to enforce the settlement

___ Fee_____
___ Process_____
_X_ Dktd_____
_√_ CtRmDep_____
___ Doc. No _____

agreement is GRANTED and that plaintiffs' complaint is DISMISSED WITH PREJUDICE.

## I.     PROCEDURAL BACKGROUND

Plaintiffs are employees of the Minerals Management Service ("MMS") of the United States Department of the Interior.  They filed this action against the Secretary, bringing claims of sex discrimination under Title VII, age discrimination under the Age Discrimination in Employment Act ("ADEA") and tortious conduct under La. Civ. Code art. 2315.

The gravamen of plaintiffs' complaint is that the MMS refused to revise their position descriptions to reflect accurately their changed and enlarged duties and that the MMS refused to upgrade their job classifications from GS-9 to GS-11, a higher pay grade that would have taken account of their enlarged duties.  Plaintiffs also brought claims for violations of the Equal Pay Act and for hostile work environment and retaliation under federal and state law for having complained about these allegedly discriminatory practices.  The complaint, amended complaint and second amended complaint were signed by their attorney, John-Michael Lawrence.  Complaint, Record Doc. No. 1; Amended Complaint, Record Doc. No. 3; Second Amended Complaint, Record Doc. No. 35.

2

This matter was referred to the undersigned magistrate judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon the written consent of all parties.  Record Doc. No. 19.

On March 10, 2005, plaintiffs' counsel advised the court by letter that he and his clients had met the previous day with defendant's counsel, Glenn K. Schreiber, and with two witnesses, Karen Dunn and Robert Hendler, and that all issues except the retaliation and Equal Pay Act claims "are likely resolved."  Lawrence stated that the remaining claims also had "a good chance of resolution."  Record Doc. No. 51.  Six days later, on March 16, 2005, counsel for the parties advised the court that the matter had been resolved.  The court entered a 60-day order of dismissal, which retained jurisdiction to enforce the settlement agreement.  Record Doc. No. 52.

More than a month later, on April 25, 2005, the court granted Lawrence's motion to withdraw as counsel for plaintiffs because he and plaintiffs had reached "an insurmountable disagreement" and plaintiffs had instructed him to return their files and halt any proceedings in connection with the 60-day dismissal order.  Record Doc. No. 53.

On May 4, 2005, the Secretary filed a timely motion for summary judgment to enforce the settlement.  Record Doc. No. 57.  Plaintiffs filed an opposition memorandum

in which each asserts that she "had not agreed and do not want to dismiss this case" and that their attorney settled "without my consent." Record Doc. No. 58.

Lawrence filed a brief on the issue of authority to settle, to which he attached several exhibits. Record Doc. No. 61.

The court held an evidentiary hearing on August 18, 2005. Defendant presented the testimony of Lawrence and Karen Dunn. Plaintiffs represented themselves. They testified on their own behalf and moved into evidence certain documents identified as Plaintiffs' Exhibit 1 in globo. The court preserved any objections that defendant might have to plaintiffs' exhibit and gave defendant time to review the documents and present his objections in writing. Defense counsel notified the court by letter dated August 25, 2005 that the Secretary has no objection to the exhibit.

II.    FINDINGS OF FACT

I find the testimony of John-Michael Lawrence entirely credible. His calm, reasoned manner of testifying and his demeanor on the witness stand inspired confidence that his recollection of events was accurate. His description of events was both internally consistent and consistent with the other credible testimony and the documentary evidence. He displayed integrity and a high degree of professional responsibility in dealing with difficult clients, and I accept his testimony in its entirety.

The testimony of Karen Dunn was also credible and consistent with the other credible testimony and documentary evidence.

Plaintiff Ieva expressed herself in a vague manner.  She had a limited understanding of the issues before the court and of the reasons for the advice given by her attorney.  In her testimony, Ieva constantly used the pronouns "we" and "us," indicating that she and Marchese acted together in pursuing the lawsuit and communicating with their attorney.  She was essentially credible concerning the sequence of events up to and including the March 9, 2005 meeting.  However, her testimony that she never authorized Lawrence to dismiss the lawsuit is contradicted by her own testimony and by that of both Lawrence and Marchese, and is completely unbelievable.

Plaintiff Marchese testified in a confused manner that revealed her limited understanding of the relevant issues and of the reasons for Lawrence's advice to dismiss the lawsuit.  Like Ieva, she often used the pronouns "we" and "us" to refer to conduct by or on behalf of herself and Ieva together.  Her testimony was equivocal and evasive concerning her understanding of the March 9th meeting and its implications for her lawsuit, and some of her testimony was contradicted by the documentary evidence.

I find her testimony that she and Ieva never authorized each other to speak for both of them in dealing with Lawrence not credible.

Plaintiffs Ieva and Marchese do the same work at the MMS and have identical position descriptions, both before and after they were reclassified from GS-9 to GS-10.

Lawrence represented plaintiffs in connection with their claims against the MMS. He did not recall whether they had a written contract with him, but said they had an understanding. Plaintiffs met with him together and orally authorized him jointly to file suit. He prepared the complaint based on what they both told him. During the course of the lawsuit, he discussed strategy and how they would proceed with both of them. They orally authorized him to conduct discovery and orally answered his questions during the course of the lawsuit. Both Ieva and Marchese provided him with written documents.

Lawrence testified that Karen Dunn, a Human Resources specialist at the MMS, was "the crux" of their case and their "star witness" because she had concluded at one time that plaintiffs' jobs should have been upgraded to GS-11.

In October 2004, at the request of defendant's counsel in this lawsuit, Robert Hendler, an expert on the government classification system who works at the Office of Personnel Management ("OPM"), performed a desk audit of plaintiffs' positions by

teleconference and wrote a report.  During a desk audit, the classifier talks to the incumbents in a particular position to clarify any questions about their job duties and to learn what the employees are actually doing in their job, and obtains samples of their work product.  Hendler's report stated that plaintiffs' jobs should be classified as GS-9 at the most.

Hendler concluded that, even though plaintiffs' jobs were being performed differently than before computerization, their duties were the same duties, were not of a higher grade level and did not meet the standards for the next higher grade level. Hendler found that plaintiffs were not even entitled to be promoted to the GS-10 level and should have remained at GS-9.

Following the production of Hendler's report, Lawrence and plaintiffs attended a meeting with Schreiber, Karen Dunn, MMS manager Ted Dunn and Hendler (by telephone) on March 9, 2005, which lasted for more than two hours.  The purpose of the meeting was to try to narrow the issues and resolve the case without going to trial by allowing plaintiffs and their attorney to question Hendler and Dunn concerning their methods and conclusions.

Hendler told plaintiffs at the meeting that they were not performing any duties beyond what they had been doing before computerization of their jobs. Hendler used a

7

different set of classification standards than Dunn had used.  He explained at the meeting why he used the newer guidelines, but he stated that plaintiffs' grade level would still have been GS-9, regardless which set of standards was used.

Dunn changed her opinion about plaintiffs' grade level as a result of talking with Hendler, based on his evaluation of their job duties and the way he explained his evaluation.  She deferred to his conclusions during the meeting.

Despite Hendler's conclusion that plaintiffs should have been classified as no more than GS-9, defendant had previously agreed to allow plaintiffs to remain at GS-10 for two years.  However, their annual raises would be adjusted so that, at the end of the two years, they would be at the top of the GS-9 pay level.

Before the meeting, Lawrence and plaintiffs had exchanged e-mails about the questions that they wanted to raise at the meeting.  They also communicated by e-mail and fax after the meeting.  Some of those pieces of correspondence are attached to the brief that Lawrence filed and some are included in Plaintiff's Exh. 1 in globo.

The written evidence indicates that Lawrence communicated with both plaintiffs at the same time in a single piece of correspondence, either requesting information from them or responding to an inquiry from only one of them by sending something to both

of them.  See, e.g., John-Michael Lawrence's Brief on the Issue of Authority to "Settle,"

Record Doc. No. 61, Exhs. 3, 7 (both addressed to "Jean and Geri").

Similarly, Marchese or Ieva individually wrote to Lawrence to convey their

mutual thoughts or directives.  For example, in a letter dated March 10, 2005, Marchese

wrote to Lawrence that "Gerry and I have been very upset since yesterday's meeting" and

she requested a copy of the relevant law because "we need to talk to our congressmen."

Plaintiff's Exh. 1 in globo (emphasis added).  In a summary or time line of events

prepared contemporaneously by Marchese, she often referred to "us," "we" and "our,"

indicating that she and Ieva acted together or were affected identically by events.

Lawrence testified that, after the March 9th meeting, he and plaintiffs "decided it

was time to put the case to bed," although neither he nor plaintiffs were happy with that

outcome.  He based his advice on Dunn's decision, after she had seen Hendler's report,

to testify at trial that she had made a mistake in finding that plaintiffs should have been

classified as GS-11.  Lawrence concluded that plaintiffs could not get a GS-11

classification, even if they proceeded to trial.

Lawrence stated that, after the meeting, he and plaintiffs agreed that Hendler's

report and anticipated testimony had "cut our legs out from under us and there was no

9

place to go." After the meeting, they obtained a copy of the regulations which Hendler had used.

Lawrence testified that plaintiffs decided to dismiss the case. He received an e-mail from Ieva agreeing to "putting it to bed." Neither Lawrence nor plaintiffs produced a copy of this e-mail exchange, but Ieva in her testimony acknowledged sending it. Lawrence considered the e-mail he had received from Ieva as her statement and agreement to put the case to bed by dismissing it.

Lawrence recalled that he also talked to Marchese on the telephone about it. He sent a letter to both of them, advising that they had no retaliation claim. His impression was that they had thoroughly discussed the case with him. He understood that they had a lot of anger, but he also understood that both plaintiffs had agreed to dismiss the case.

After the court entered the 60-day order of dismissal at the request of both counsel, Lawrence sent a motion to dismiss to plaintiffs for their signatures. They refused to sign the motion and told him to stop all processes toward dismissal. He testified that they had experienced "buyer's remorse" and had changed their minds about dismissing the case.

Karen Dunn has been a Human Resources specialist at the MMS with special expertise in staffing and classification since 1995. Marchese and Ieva rewrote their own

10

position description, using the GS-11 classification standards from the OPM, and gave

it to their supervisor, Alex Alvarado.  Dunn initially rated it as GS-11.  However, she

sent it back twice for revisions.

One version of the new position description that Dunn had received included

verbatim language from the government classification standards for GS-11.  She testified

that the verbatim language of the standards in a position description "throws up a red

flag" to a classifier.  When she saw that language in plaintiffs' position description, she

talked to Alvarado.  He agreed that the description was not really accurate, and he

rewrote it to reflect what plaintiffs actually did.  Dunn said she classified the position as

GS-10 based on that revised description and plaintiffs were then promoted to GS-10.

Dunn applies standards received from the OPM.  She acknowledged, however,

that the OPM is the expert.  She and her agency are required to defer to the OPM

concerning classification decisions.

All of plaintiffs' questions had been answered at the March 9th meeting.  Plaintiffs

did not appear happy at the end of the meeting.  After the meeting, defendant's counsel

asked Dunn for a copy of the merit promotion guidebook, which she gave to him.

Dunn had thought at one time that plaintiffs were entitled to GS-11 classification,

but she changed her mind at the March 9th meeting.  She was not "forced" to concede

to Hendler's opinion. He is the expert and, by regulation, the OPM's decision is final and authoritative over her classification.

Ieva testified that Lawrence had told her that Hendler's desk audit did not come out well. She thought that their case always seemed strong until the March 9th meeting with Dunn and Hendler, but it did not seem so strong after that. Dunn told plaintiffs at the meeting that she had made a mistake and that she deferred to Hendler's conclusions. Ieva admitted that she learned at the meeting that a GS-11 classification was not possible as a matter of law.

Marchese and Ieva stayed in the conference room and talked with Lawrence after the meeting. Lawrence told them that he felt there was no sense in going on with the case at that point.

Ieva exchanged e-mails with Lawrence after the meeting. She testified that Lawrence had told her and Marchese that it was "hopeless and useless" to continue the lawsuit. Ieva said that he was "pushing us to let go and put the case behind us."

Marchese's time line confirms that Lawrence told both plaintiffs on March 9th that the "case is over, accept it and move on with our lives. He wants us to dismiss the case. He said retaliation still on going [sic] but felt it was fruitless to continue." Her time line indicates that she (or perhaps both plaintiffs) received an e-mail from Lawrence on

March 14th, stating that he was mailing the law she had requested "and he tried to convince us our case is over." The time line further states that Marchese and Ieva received the joint motion to dismiss on March 30th, but "[w]e did NOT sign or return the letter." She indicates that plaintiffs received an e-mail from Lawrence "telling us to put the case to bed" on April 4, 2005. Plaintiff's Exh. 1 in globo.

Ieva told Lawrence in an e-mail some time after the March 9th meeting that, if he thought they should dismiss the case, she agreed. She believed that Lawrence thought the case should be over when she sent that e-mail. Ieva testified that she never thought an e-mail would be a signed legal statement. She testified that she never agreed to dismiss the case and she wanted to continue with the case, even after the March 9th meeting. However, this testimony contradicted her admission that she had e-mailed Lawrence and agreed to follow his recommendation to put the case behind them.

Ieva's testimony that she did not understand that her lawyer would act on the e-mail communication from her is not credible, when she had a pattern of communicating with Lawrence by e-mail and orally. I find that Ieva changed her mind <u>after</u> she told Lawrence that she agreed with his recommendation to dismiss the case.

Marchese admitted that Lawrence advised her and Ieva after the March 9th meeting that they did not have a case and they should dismiss it. She said she told him

she wanted to think about it.  She said she did not engage in any e-mail correspondence with him after the meeting, except to ask him for a copy of the regulations discussed at the meeting.  In reviewing the exhibits, however, she admitted that she had received an e-mail from Lawrence on March 14, 2005, in which he "tried to convince us our case is over."  Plaintiff's Exh. 1 in globo.

Marchese confirmed the accuracy of the contents of another e-mail from Lawrence to Schreiber dated March 10, 2005, in which Lawrence stated:  "My advice to [plaintiffs] was that the grade issues were over.  They faced reality but, as happens with emotional bi-peds [sic], they will boil and re-boil, needing additional comment from me on the issue."  Record Doc. No. 57, Defendant's Motion to Enforce Settlement, Attachment 7. Marchese testified that Lawrence's comment about facing reality meant that "we faced the fact that, according to Hendler, the grade level [issue] was over."  However, she stated that she thought it was only Hendler's opinion, not a fact.  Marchese said she was "not sure" if she understood at the time that the OPM had the final say over the matter.

This evasive testimony was directly contradicted by the credible testimony of Lawrence and Dunn.  Even Ieva admitted that she understood during the meeting that a GS-11 classification was not possible as a matter of law.

Marchese confirmed that she spoke to Lawrence by telephone on March 15, 2005 and that the contents of that conversation were accurately reported by Lawrence in an e-mail to Schreiber the same day. Lawrence stated in the e-mail that Marchese "was upset re: my verbal report and the meeting. She and Geri will get back to me tomorrow a.m." Record Doc. No. 57, Defendant's Motion to Enforce Settlement, Attachment 7.

Marchese knew that Ieva had exchanged e-mails with Lawrence after the meeting. She had seen a copy of the e-mail exchange. Marchese recalled that, in the e-mails, Ieva had questioned Lawrence about what he advised, and he responded that the case "should be put to bed." There is one e-mail in the record from Lawrence to both plaintiffs dated March 14, 2005, which has as its subject heading "Time to put the case to bed and move on, but prepared." Record Doc. No. 61, John-Michael Lawrence's Brief on the Issue of Authority to "Settle," Exh. 7. Marchese recalled that Ieva's e-mail response to Lawrence was that if he thought it should be put to bed, that was okay.

Marchese said Ieva did not discuss that e-mail response with her and she did not agree with it. She testified that, although Lawrence kept "pushing for us to settle the case," she never gave him permission to dismiss the case.

The court entered its 60-day order of dismissal on March 16, 2005, upon being advised by counsel for both parties that the matter had been resolved. Marchese received

the motion to dismiss from Lawrence on March 30th and faxed a letter to him on April 7th, stating that "we" do not want to dismiss the case.

Marchese testified that neither she nor Ieva ever appointed one of them to speak for the other in their dealings with Lawrence. She said that occasionally one would speak for both of them, but that they also spoke individually with him on other occasions.

## III.   CONCLUSIONS OF LAW

"Whereas federal courts sitting in diversity apply state law when determining the validity of a settlement agreement, the Fifth Circuit has long held that the enforceability or validity of settlement agreements are [sic] determined by federal law 'where the substantive rights and liabilities of the parties derive from federal law.'" Turner Marine Fleeting, Inc. v. Quality Fab & Mech., Inc., No.02-0091, 2002 WL 31819199, at *4 (E.D. La. Dec. 13, 2002) (Vance, J.) (quoting Mid-South Towing Co. v. HarWin, Inc., 733 F.2d 386, 389 (5th Cir. 1984)) (additional citations omitted); accord Chaplin v. NationsCredit Corp., 307 F.3d 368, 372 (5th Cir. 2002) (action for ERISA benefits); Macktal v. Secretary of Labor, 923 F.2d 1150, 1157 n.32 (5th Cir. 1991) (federal whistleblower action) (citing Town of Newton v. Rumery, 480 U.S. 386, 392 (1987) (Section 1983 action)); Zim Israel Navig. Co., Ltd. v. Special Carriers, Inc., 800 F.2d

1392, 1394 (5th Cir. 1986) (admiralty action); <u>Mid-South Towing Co.</u>, 733 F.2d at 389 (same); <u>Fulgence v. J. Ray McDermott & Co.</u>, 662 F.2d 1207, 1209 (5th Cir. 1981) (Title VII action); <u>Offshore Marine Contractors, Inc. v. Laborde Marine Crewboats, LLC</u>, No. 04-1088, 2005 WL 3533706, at *1 (E.D. La. Dec. 1, 2005) (McNamara, J.) (admiralty action). In this case, the parties' rights and liabilities derive exclusively from federal law. Thus, this court will apply "the federal common law of contract interpretation in deciding whether to enforce a settlement agreement" in this action brought under Title VII, the ADEA and the Equal Pay Act. <u>Turner Marine Fleeting, Inc.</u>, 2002 WL 31819199, at *4.

Although an attorney may not compromise a matter without the consent of his clients, the attorney of record is presumed to have authority to settle his clients' case, and the burden to rebut this presumption falls on the clients who contend that their attorney had no such authority. <u>In re Artha Mgmt. Inc.</u>, 91 F.3d 326, 328 (2d Cir. 1996); <u>Anderson v. Flexel</u>, 47 F.3d 243, 249 (7th Cir. 1995); <u>Michaud v. Michaud</u>, 932 F.2d 77, 80 (1st Cir. 1991); <u>Greater Kan. City Laborers Pension Fund v. Paramount Indus.</u>, 829 F.2d 644, 645 (8th Cir. 1987); <u>Mid-South Towing Co.</u>, 733 F.2d at 390; <u>Terrain Enters., Inc. v. Western Cas. & Sur. Co.</u>, 774 F.2d 1320, 1322 (5th Cir. 1985).

It is undisputed that Ieva sent an e-mail to Lawrence, in which she agreed with his recommendation to dismiss the case. Thus, there is no question that Lawrence had actual and express authority from Ieva to "settle" the case.

As to actual authority from Marchese, Lawrence testified that he recalled speaking to Marchese on the telephone about dismissal, but he did <u>not</u> testify specifically that she told him to dismiss. Marchese testified that she never expressly told Lawrence that she wanted to dismiss the case. No evidence contradicts this statement. Thus, Lawrence had no express authority from Marchese to dismiss her lawsuit.

Similarly, there is no evidence that Marchese specifically authorized Ieva to dismiss the case on Marchese's behalf. Marchese testified that she did not tell Ieva to send the e-mail to Lawrence in which Ieva agreed with Lawrence's recommendation. Marchese testified that she did not agree with the e-mail that Ieva sent. There is no documentary or testimonial evidence that Marchese ever gave Ieva that specific authority. Thus, Ieva had no express, specific authority from Marchese to dismiss the case on Marchese's behalf.

The issue remains whether Ieva had <u>apparent</u> authority to tell Lawrence to settle the case by dismissing it on behalf of <u>both</u> plaintiffs.

18 ·

Under federal common law, apparent authority "exists where the principal engages in conduct that 'reasonably interpreted' causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.  The burden of proving an agency relationship falls on the person asserting its existence . . . . " Lamar Co., LLC v. National Labor Relations Bd., No. 04-60416, 2005 WL 806721, at *3 (5th Cir. Apr. 8, 2005) (quoting Restatement (Second) of Agency § 27 (1992)).  "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement (Second) of Agency § 27 (emphasis added).

"Stated otherwise, '[a] party claiming apparent authority of an agent must prove (1) that the acting party subjectively believed that the agent had authority to act for the principal and (2) that the subjective belief in the agent's authority was objectively reasonable.'" Poly-America, Inc. v. National Labor Relations Bd., 260 F.3d 465, 480 (5th Cir. 2001) (quoting Myers v. Bennett Law Offices, 238 F.3d 1068, 1073 n.2 (9th Cir. 2001); citing Restatement (Second) of Agency § 27).

"[T]he mere lack of actual authority does not factually or legally rebut the binding effect of apparent authority." Id. at 536 (citing Clark Advertising Agency v. Tice, 490 F.2d 834, 835-36 (5th Cir. 1974) ("concluding that where a president left detailed negotiation work to a comptroller and a vice-president, those two officers had apparent authority to bind the corporation, and the corporation was estopped from denying their authority, regardless of '[w]hether or not [the officers] actually had express or implied authority to bind [the corporation]'")); Restatement (Second) of Agency § 159 cmt. c (1958) ("'A person who is not authorized to make a contract on behalf of a principal but who has apparent authority to do so, subjects both the principal and the other party to liability to the same extent as if the contract were authorized.'") (emphasis by the court).

Marchese testified that she never gave Ieva authority to speak for her regarding the conduct of the lawsuit. However, this testimony, even if it were credible, does not prevent apparent authority from vesting in Ieva as concerns Marchese's dealings with Lawrence. The documentary evidence and the testimony of Lawrence and both plaintiffs reveals that plaintiffs acted together in hiring Lawrence and thereafter in directing him in the conduct of their jointly filed lawsuit. Each plaintiff asked questions and conveyed information to Lawrence on behalf of both and generally presented a united front in their dealings with Lawrence, and he did likewise in dealing with them. Marchese's conduct

reasonably led Lawrence to believe that Ieva spoke for her in their dealings with him and the conduct of their lawsuit.

Therefore, Lawrence's interpretation of Ieva's e-mail as giving him authority to dismiss the case for both plaintiffs was within the scope of Ieva's apparent authority from Marchese. Lawrence's reliance on that e-mail instruction as applying to both Ieva and Marchese was reasonable. In addition, Lawrence's testimony made clear that he actually believed that Ieva was instructing him to dismiss the case on behalf of both plaintiffs.

I find that the credible evidence establishes that Lawrence had plaintiffs' authority to settle by dismissing the case. Even in the absence of the presumption of validity, the preponderance of the credible evidence established that plaintiffs, through Ieva, voluntarily and knowingly consented to dismiss their lawsuit to settle their case. In addition, the parties compromised by agreeing that plaintiffs would be classified at the higher GS-10 level, rather than the lower GS-9 level that they occupied when they filed suit or the higher GS-11 level they sought in the suit. Lawrence's completely credible testimony, the joint manner in which plaintiffs conducted themselves throughout this litigation and the undisputed, contemporaneous exchange of e-mail correspondence between him and Ieva establish that both plaintiffs gave him authority to settle their claims on the terms incorporated in the correspondence and the written settlement

agreements.  Binding, enforceable settlement agreements were formed, which plaintiffs cannot repudiate after the fact.

CONCLUSION

To whatever extent, if any, any of the foregoing findings of fact constitute conclusions of law and vice versa, they are adopted as such.  For the foregoing reasons, IT IS ORDERED that defendant's motion to enforce the settlement is GRANTED and plaintiffs' complaint is DISMISSED WITH  PREJUDICE, each party to bear its own costs of this proceeding.  Judgment will be entered accordingly.

New Orleans, Louisiana, this _____ day of January, 2006.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

THE CLERK IS DIRECTED
TO NOTIFY PLAINTIFFS,
COUNSEL OF RECORD and
JOHN-MICHAEL LAWRENCE
Attorney-at-Law
1100 Poydras Street, Suite 2900
New Orleans, LA
70163-2900
VIA FIRST CLASS UNITED STATES MAIL,
in addition to any electronic notice previously
requested by these parties